UNITED STATES DISTRICT COURT

DISTRICT OF NEW HAMPSHIRE

C.B. Sullivan Company, Inc.,
    Plaintiff

    v.                                          Civil No. 07-cv-170-SM
                                                 Opinion No. 2008 DNH 021
Graham Webb International, Inc.,
    Defendant

# **O R D E R**

In January of 2007, defendant, Graham Webb International ("GWI"), notified plaintiff, C.B. Sullivan Company ("Sullivan"), that it no longer required Sullivan's services as a distributor of its products and, therefore, was terminating the parties' contractual relationship, effective April 1, 2007. Sullivan filed suit against GWI in the New Hampshire Superior Court, advancing three state law claims, each of which arises out of GWI's allegedly wrongful conduct relating to that termination.

Invoking this court's diversity jurisdiction, GWI removed the case here, and now moves to dismiss each of Sullivan's three claims, saying they are subject to the parties' various arbitration agreements. Sullivan objects. For the reasons set forth below, GWI's motion to dismiss is granted in part and denied in part.

**Background**

GWI is a manufacturer of beauty supply products, including hair, personal care, and fragrance products.  Sullivan is a distributor of beauty supply products in New England and operates more than two dozen wholesale beauty supply stores in that region.  In February of 1998, the parties entered into a distribution agreement, pursuant to which GWI granted Sullivan the exclusive right to sell its products to professional stores in New Hampshire, Vermont, and Maine, and to sell its products to both professional stores and salons in Massachusetts (the "Sullivan Distribution Agreement" or the "SDA").  Exhibit 2 to Affidavit of Jack B. Middleton (document no. 7-5).  Among other things, the SDA provided that "[a]ll disputes and claims relating to or arising under or out of this Agreement shall be fully and finally settled by arbitration."  Id. at para. 22.

The Sullivan Distribution Agreement (as extended by the parties) expired on May 31, 2003.  See Exhibit A to Affidavit of Charles B. Sullivan (document no. 9-2).  Nevertheless, the parties continued their relationship under the same terms and conditions as had governed that relationship when the SDA was still in force.

2

Approximately two-and-one-half years later, in November of 2005, another of GWI's regional distributors – Kaleidoscope/BOA, Inc. – assigned to Sullivan all of its "right, title, and interest under the Kaleidoscope Distribution Agreement [with GWI] dated August 16, 2004, save and except the right to distribute Graham Webb Classic line products to salons in the territory." Assignment/Sale of Distributorship (document no. 7-8) at 2 (the "Assignment Agreement").  GWI assented to that assignment.

By acquiring an assignment of Kaleidoscope's rights under its distribution agreement with GWI, Sullivan obtained the exclusive right to distribute GWI products to professional salons in Maine, New Hampshire, and Vermont (previously, it had the exclusive right to distribute GWI products only to professional stores in those states).  Like the original distribution agreement between GWI and Sullivan, both the distribution agreement between Kaleidoscope and GWI (the rights under which were assigned to Sullivan) and the agreement evidencing that assignment contained arbitration provisions.  See Assignment Agreement (document no. 7-8) at 3; Domestic Distribution Agreement between GWI and Kaleidoscope (the "Kaleidoscope Distribution Agreement") (document no. 7-6) at para. 23.

3

Despite the fact that the Sullivan Distribution Agreement had expired, the Assignment Agreement specifically references that document, describing the parties' respective rights and obligations and noting that the SDA will have to be amended to take into account Sullivan's newly expanded distribution rights. The parties' reference to the Sullivan Distribution Agreement in the Assignment Agreement provides strong evidence that, although the SDA agreement had expired, the parties were continuing their business relationship pursuant to its terms.

A little more than a year later, by letter dated January 31, 2007, GWI notified Sullivan of its intention to terminate its distribution relationship with Sullivan, effective April 1, 2007. In that letter, GWI specifically invoked the termination provisions contained in both the Sullivan Distribution Agreement and the Kaleidoscope Distribution Agreement.  When Sullivan was unable to persuade GWI to change its mind, it filed this suit alleging that GWI breached its implied contractual obligation to act fairly and in good faith, engaged in unfair and deceptive trade practices, and tortiously interfered with Sullivan's advantageous contractual relations with its customers.

4

GWI moves to dismiss Sullivan's three state law claims, asserting that each relates to, or arises under or out of: (1) the original Sullivan Distribution Agreement; (2) the Kaleidoscope Distribution Agreement, which was assigned to Sullivan; and/or (3) the Assignment Agreement – all of which contain comprehensive arbitration provisions.  Sullivan objects, asserting that the arbitration provision in the Assignment Agreement is not relevant to this dispute and claiming that it is not bound by the arbitration provisions in the Kaleidoscope Distribution Agreement.  It also says that because its original distribution agreement with GWI expired on May 31, 2003, GWI cannot now seek to enforce that agreement's arbitration provisions.  The court disagrees.

**Discussion**

I.   General Legal Principles.

As the Supreme Court has made clear, "[w]hen deciding whether the parties agreed to arbitrate a certain matter (including arbitrability), courts generally . . . . should apply ordinary state-law principles that govern the formation of contracts." First Options of Chicago, Inc. v. Kaplan, 514 U.S. 938, 944 (1995).  Under New Hampshire law, "a contractual provision creating a right to arbitration [is] subject to the

5

traditional principles of contract law, and its interpretation and construction is therefore a question of law for the court." Demers Nursing Home v. R.C. Foss & Son, 122 N.H. 757, 760 (1982). See also J. Dunn & Sons v. Paragon Homes of New England, 110 N.H. 215, 217 (1970) ("It is well settled law here and elsewhere that the scope of an arbitration clause in a contract presents a question of law for the court.  Such a clause is to be interpreted so as to make it speak the intention of the parties at the time it was made bearing in mind its purpose and policy.") (citations and internal punctuation omitted).

It is, then, the court's obligation to determine whether the parties, by their written agreements and through their course of dealings, evidenced an intention to submit their current disputes to arbitration.  They did.

II.  The Original Distribution Agreement.

Notwithstanding the fact that the parties' written contract – the Sullivan Distribution Agreement – expired in 2003, Sullivan is bound by that agreement's arbitration provisions.  The arbitration clause contained in that contract provides:

> All disputes and claims relating to or arising under or out of this Agreement shall be fully and finally settled by arbitration in Minneapolis, Minnesota

6

> pursuant to the rules of commercial arbitration of the
> American Arbitration Association and the terms of the
> Federal Arbitration Act.  The decision of the
> arbitrator or arbitrators shall be final and may be
> enforced by any court of competent jurisdiction.  The
> foregoing paragraph of this Section <u>shall survive any
> termination of this Agreement</u>.

Sullivan Distribution Agreement (document no. 7-5) at para. 22

(emphasis supplied).  Plainly, then, the parties contemplated

that any disputes arising out of their commercial relationship

and relating to Sullivan's distribution of GWI's products in New

England would be submitted to binding arbitration – even those

that might arise after the agreement expired or the parties

terminated their relationship.  Equally plain is the fact that

Sullivan's state law claims arise directly out of GWI's decision

to terminate Sullivan as its exclusive distributor of GWI

products in this region.  Those claims are, then, properly

subjected to arbitration.  <u>See, e.g.</u>, <u>Gaston Andrey of

Framingham, Inc. v. Ferrari of N. America, Inc.</u>, 983 F. Supp. 18,

20-21 (D. Mass. 1997) ("There is no doubt here that the parties

had agreed in their written franchise agreement to submit to

arbitration 'any and all disputes arising out of or in connection

with this Agreement.'  Whether the obligation to arbitrate

endured as the parties continued their business relationship

without a renewed written franchise agreement is a dispute

'arising out of or in connection with' the last written agreement

they had.") (citations omitted).  See also Providence Journal Co.
v. Providence Newspaper Guild, 308 F.3d 129, 132 (1st Cir. 2002)
("The expiration of a collective bargaining agreement does not
necessarily extinguish a party's obligation to arbitrate
grievances.  In fact, a presumption favors arbitration in such
circumstances.").

     Even if the SDA did not specifically provide that its
arbitration provisions survived termination of the contract,
Sullivan would still be obligated to arbitrate its current claims
against GWI.  Because the parties allowed the SDA to expire, but
continued a course of dealing prescribed by that contract, they
were operating under what is typically viewed as a contract
implied-in-fact.  See, e.g., Lorenz v. N.H. Admin. Office of the
Courts, 152 N.H. 632, 638 (2005) ("A contract implied in fact is
based on a promise manifested in language, conduct, silence or by
implication from the circumstances, including a course of dealing
or course of performance." (citing Restatement (Second) of
Contracts § 4 at 3 (1981)).  See also  Newfield House, Inc. v.
Mass. Dep't of Public Welfare, 651 F.2d 32, 36 (1st Cir. 1981)
("Our task in such matters is one of resolving the obviously
unanticipated problem that has arisen in a way that effectuates
the parties' contractual intent or, if it is clear that the

8

parties had no meaningful intent as to the matter, as one of
construing their dealings so as to give them the most appropriate
legal effect.  Put another way, we look here first to the
intended terms of what we discern as an actual implied-in-fact
contract between the parties and then to the terms imposed in any
event by the constructive quasi-contract implied in law between
them. . . . . In supplying a term omitted from the implied actual
contract, our focus must be on what it is likely that the parties
would have agreed upon had they focused on the problem.")
(citations and footnote omitted).

        Although the parties allowed the SDA to lapse without
further extension, they continued to conduct their business
relationship in accordance with the terms and conditions set
forth in the SDA and even referenced the SDA several times in the
later Assignment Agreement.  So, by their ongoing course of
dealings, the parties plainly manifested an intention to have
their conduct governed by the terms of the SDA – including its
arbitration provisions.

III. <u>The Kaleidoscope Distribution Agreement and the Assignment</u>.
        Despite the fact that the Kaleidoscope Distribution
Agreement contains a broad arbitration provision, Sullivan says

                                    9

it did not agree to be bound by that provision when it took the
assignment of Kaleidoscope's rights under that agreement.
Accordingly, says Sullivan, it is not required to arbitrate
disputes arising out of distribution rights acquired from
Kaleidoscope.  Again, the court disagrees.

In support of its position, Sullivan asserts that, "While it
is true that in 2005 CB Sullivan agreed to purchase 'certain
assets' of Kaleidoscope and to accept an 'assign[ment] [of]
portions of Kaleidoscope's distribution agreement,' CB Sullivan
never agreed to become a party to that agreement or otherwise to
be bound by the arbitration clause therein."  Plaintiff's
objection (document no. 8) at 3.  But, Sullivan's intent at the
time, as expressed in the Assignment Agreement, suggests
otherwise.

Under the Assignment Agreement, Sullivan acquired "all of
Kaleidoscope's right, title, and interest under the Kaleidoscope
Distribution Agreement dated August 16, 2004, save and except the
right to distribute Graham Webb Classic line products to salons
in the territory."  Assignment Agreement (document no. 7-8) at 2,
para. 1.  Accordingly, as to any rights or remedies against GWI,
Sullivan stood in Kaleidoscope's shoes.  That is, it acquired

10

only those rights possessed by Kaleidoscope, so its "right" to assert claims against Sullivan arising out of their relationship was constrained by the limitations imposed on Kaleidoscope by the Kaleidoscope Distribution Agreement.  See generally City of Hope Nat'l Med. Ctr. v. HealthPlus, Inc., 156 F.3d 223, 228 (1st Cir. 1998) ("It is generally understood that 'the assignee acquires rights similar to those of the assignor, and is put in the same position with reference to those rights as that in which the assignor stood at the time of assignment.') (quoting 3 Samuel Williston & Walter H.E. Jaeger, A Treatise on the Law of Contracts § 404, at 5 (3d ed. 1960)).  See also Smith v. Cumberland Group, 455 Pa. Super. 276, 285-86, 687 A.2d 1167, 1172 (Pa. Super. 1997) ("Where an assignment is effective, the assignee stands in the shoes of the assignor and assumes all of his rights.  Among these rights are the remedies the assignor once possessed.  Conversely, an assignee's right against the obligor is subject to all of the limitations of the assignor's right, to all defenses thereto, and to all set-offs and counterclaims which would have been available against the assignor had there been no assignment, provided that these defenses and set-offs are based on facts existing at the time of the assignment.").  Consequently, absent evidence that the parties specifically intended otherwise, Sullivan would, as the

11

assignee of all of Kaleidoscope's rights under the Kaleidoscope Distribution Agreement, be bound by that agreement's arbitration provisions.

Even if GWI and Sullivan understood (and agreed) that Sullivan would not be bound by the specific arbitration provisions in the Kaleidoscope Distribution Agreement when it took an assignment of Kaleidoscope's rights (a point for which Sullivan has provided no evidence), the parties still evidenced an intention to arbitrate any disputes arising out of, or relating to, that contract.  In the Assignment Agreement, GWI and Sullivan specifically acknowledged that they would amend both the Sullivan Distribution Agreement and the Kaleidoscope Distribution Agreement to reflect Kaleidoscope's assignment of various rights to Sullivan.

> To complete this transaction, it will be necessary to make certain amendments to the distribution agreements to reflect the change in distribution rights.  In this regard, we will need to amend the CB Sullivan Distribution Agreement to include salon rights for Maine, Vermont, and New Hampshire; in the case of the Kaleidoscope Distribution Agreement, we will need to amend the distribution agreement to delete the salon sales rights for all brands except the Graham Webb Classic Line.  The parties agree to execute such amendments, and sign such other documents as may be necessary to complete this transaction.

Id. at 3.  That language suggests two things.  First, as noted
above, it reveals that, although the Sullivan Distribution
Agreement had lapsed, the parties were plainly behaving as though
it still remained in effect, governing all of their respective
rights and obligations.

Second, the Assignment Agreement's language quoted above
plainly demonstrates that the parties intended Sullivan's newly-
acquired distribution rights to be governed by the Sullivan
Distribution Agreement (or the implied-in-fact contract that
replaced it upon the SDA's expiration) – including, of course,
the SDA's arbitration provisions.  That is, the parties
unmistakably contemplated amending Sullivan's existing
distribution agreement with GWI to include the newly-acquired
distribution rights.  Consequently, any disputes relating to, or
arising under or out of, Sullivan's distribution of GWI products
in the New England region would be governed by the SDA.  That, in
turn, would require that any such disputes be arbitrated.  This
case involves just such a dispute.

Finally, to the extent there is any confusion about what the
parties intended when they executed the Assignment Agreement,
that, too, must be arbitrated.  See id. at 3 ("In the event of

13

any dispute arising from or pertaining to this agreement, the parties agree to submit such dispute to binding arbitration before the American Arbitration Association in accordance with its rules for commercial matters.").

## Conclusion

Each of Sullivan's three state law claims against GWI arises out of the parties' business relationship and GWI's decision to terminate that relationship.  And, each of the contracts governing the terms and conditions of that relationship contains a comprehensive arbitration provision, one of which – the Sullivan Distribution Agreement – specifically provides that the obligation to arbitrate any disputes between the parties shall survive termination of the agreement itself.  Thus, GWI and Sullivan have plainly and consistently evidenced a desire to submit any and all disputes arising out of their business relationship to arbitration.

In light of the foregoing, and for the reasons set forth in GWI's memoranda, GWI's motion to dismiss (document no. 7) is granted in part and denied in part.  It is granted to the extent it seeks an order of the court remanding this case for arbitration in accordance with the parties' agreements.  In all

14

other respects, that motion is denied.  The Clerk of the Court shall administratively close the case, subject to reopening upon motion of either party after Sullivan's claims have been fully arbitrated.

　　　　**SO ORDERED.**

　　　　　　　　　　　　　　　　_____
　　　　　　　　　　　　　　　　Steven J. McAuliffe
　　　　　　　　　　　　　　　　Chief Judge

January 28, 2008

cc:  Steven E. Grill, Esq.
　　　Joanne e. Caruso, Esq.
　　　Michael L. Resch, Esq.
　　　Scott H. Harris, Esq.
　　　Coleen M. Penacho, Esq.

15